## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-305 (JEB)** |
| **SARA CARPENTER,** | |
| **Defendant.** | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Sara Carpenter to 66 months of incarceration, three years of supervised release, $2,000 in restitution, and a mandatory assessment of $280. The recommended sentence of 66 months' incarceration is at the midpoint of the Guidelines as calculated by the government of 57-71 months.

### I.      INTRODUCTION

The defendant, Sara Carpenter, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The

Carpenter, an unemployed former New York City Police Department ("NYPD") officer, was intent on entering the Capitol and stopping the certification. After breaching the West front of the Capitol, Carpenter swiftly made her way up the Inaugural Stage, ignoring barriers, a line of police officers, and a blaring alarm. She entered the Capitol through the Upper West Terrace emergency exit doors, all the while gleefully shaking her tambourine. Once inside the Rotunda, Carpenter rallied other rioters to follow her into the Old Senate Chamber hallway. There, Carpenter made her way up to the front of a mob and faced another line of officers, screaming at them: "I am a fucking animal," "it ain't stopping," "do you hear me back there?" Carpenter's actions ignited the crowd behind her, who pushed against the police in an effort to get past them. During the confrontation, Carpenter made physical contact with an officer, swatting her tambourine at him. After more than thirty minutes inside the Capitol, Carpenter was pushed out through the Rotunda Doors by police.

The government recommends that the Court sentence Carpenter to 66 months of incarceration for her conviction after trial of engaging in a Civil Disorder, in violation of 18 U.S.C. § 231, and Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2, as well as five misdemeanors. A 66-month sentence reflects the gravity of Carpenter's conduct, her complete lack of remorse, and the need to deter others from engaging in political violence.

---

Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021, Attack on the Capitol

The government refers the court to the stipulated Statement of Facts filed in this case, ECF 1-1, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election. *See also* Government Trial Exhibits (GEX) 101, 114, and 801.

### B.      Sara Carpenter's Role in the January 6, 2021, Attack on the Capitol

#### *Pre-January 6, 2021*

Leading up to January 6, 2021, Carpenter was extremely aware of the importance of the January 6 Certification, texting a "count-down clock" for the Certification to a friend. GEX 938. On the night prior to January 6, Carpenter anticipated the chaos that was about to ensue, and texted a friend joking about her funeral if she did not "come back." *GEX 939*.

#### *Approach to the Capitol*

In the early morning hours of January 6, 2021, Carpenter drove from her home in Long Island, New York to Washington, D.C. to attend the former President's rally. Carpenter attended the rally, taking photos and videos as well as listening to former President Trump's speech. During his speech, former President Trump asked his supporters to go down to the Capitol. *GEX 2001*.



*Image 1: Photograph from Carpenter's phone. During his speech, former President Trump asked his supporters to go down to the Capitol (GEX 2001).*

After the speech, Carpenter regrouped at the former Trump International Hotel before making her way down to the Capitol. At approximately 2:05 p.m., Carpenter reached the west grounds of the Capitol. Carpenter took numerous photographs of other protester's signs on her way to the grounds that emphasized her motive in entering the Capitol: stopping the stolen election. *See* GEX 913, 904, and 910. Carpenter also took the below picture of a makeshift gallows which highlighted her endorsement of the violence needed to stop the 2020 election process.

4



*Image 2*: *Photograph from Carpenter's phone of a noose/gallows (GEX 908).*

### Sara Carpenter's Conduct on Capitol Grounds

At about 2:27 p.m., Carpenter made her way up the south side of the west lawn. As she approached, the West front of the Capitol was in utter chaos. Rioters had been battling officers for position on the West Plaza. Both officers and members of the mob were deploying gas agents at each other. After the rioters broke through the police line at around 2:28 p.m., officers spent the next ten minutes retreating up temporary steps to the Inaugural Stage set up on the Lower West Terrace. *See* GEX 114. By 2:41 p.m., the Inaugural Stage had been completely overrun by the mob and Carpenter took advantage of this retreat, marching up the temporary Inaugural Stage stairs with her tambourine overhead. *See* GEX 307. As she ascended to the stage, tear gar smoke filled the crowd on the West Plaza.

5



*Image 3: Still from CCTV footage showing the large riot, smoke, and MPD and USCP officers retreating up the same stairs Carpenter would use a short time later (GEX 114).*



*Image 4: Still from GEX 307 showing the Carpenter starting her assent of the Inaugural Stage at approximately 2:41 p.m.*

Once on the Inaugural stage, Carpenter ascended the bleachers, photographing her progress towards the Capitol building.



*Image 5: Photograph from Carpenter's phone of the bleachers (GEX 901).*

From her position on the bleachers, Carpenter saw a line of MPD officers gathering below her on the south end of the Upper West Terrace. The officers had congregated just south of the bleachers, determining this to be the safest position as they waited for reinforcements. 3/7/23 Tr. Tran. at 157. Lieutenant Dove described how badly the officers were outnumbered, likening the scene to an ocean of people. Trial Tran. at 157. Furthermore, Lt. Dove described how he had "never seen anything like January 6," and that was in comparison to working in the District on September 11, during the anthrax scares, and during the D.C. sniper scare. 3/7/21 Tr. Trans at 168. Carpenter was in the middle of this chaos as other rioters, nearby on the bleachers, screamed expletives at

officers while others sprayed the officers with fire extinguishers. *See* GEX 404, 501, and 505.



***Image 6***: *Still from GEX 506 showing officers engulfed in spray from a fire extinguisher deployed by a rioter on the bleachers. Carpenter's tambourine can be heard as the unidentified person sprays the officers.*

Undeterred by the violence she had already seen rioters use against police, or the police presence below her, Carpenter marched down the back of the bleachers, onto the Upper West Terrace, physically moved a metal barrier, and continued toward the Capitol. *See* GEX 401. Turning away from the line of officers defending the south end of the Upper West Terrace, Carpenter, with her tambourine held high above her head, marched towards the Northwest Courtyard. *See* GEX 404, 501, 503, and 506. Carpenter's brazenness inspired other rioters to follow her lead, moving down from the bleachers to the Upper West Terrace.



*Image 7: Still from GEX 401 showing Carpenter shortly after moving the bike rack barrier at the bottom of the bleacher stairs with her tambourine held high.*

After crossing the courtyard, Carpenter swiftly made her way towards the emergency doors located in the center of the Upper West Terrace. Right outside these doors, Carpenter's fellow rioters had been using inaugural stage construction material and stolen barriers to build an obstacle between the rioters and officers. Carpenter was not slowed by the makeshift barrier, moving a bike rack barrier clearly marked "AREA CLOSED" and marched up the steps to the Upper West Terrace doors. *GEX 503.*



***Image 8****: Zoomed in still from GEX 503 showing Carpenter moving a barrier clearly marked "AREA CLOSED."*



***Image 9****: Still from GEX 503 showing the makeshift barricade and UWT doors.*

The Upper West Terrace doors, which were rarely used as they had been designated as a fire/emergency exit. The doors were affixed with signs and alarms. 3/7/23 Trial Tr. at 194. USCP officers had been trying their best to close the doors and calm the mass of rioters desperate to get into the Capitol. *Id*. at 194-196. Just as Carpenter approached the entrance, USCP Lt. Ceresa received a radio transmission calling for back-up due to shots fired on the House floor. Lt. Ceresa pulled his officers to assist at the House because he "knew as soon as they started coming in, the five of us were doing no good there. Maybe we could do some good at the House floor." 3/8/23 Trial Tr. at 13. As Lt. Ceresa pulled his officers back, Carpenter marched up the steps and into the Capitol at approximately 2:44 p.m.



***Image 10****: Still from GEX 301 which captured Carpenter swiftly moving through the crowd gathered at the Upper West Terrace doors.*

Once inside, Carpenter walked up a staircase leading directly to the Rotunda. Within thirty seconds of her entrance, Carpenter was in the heart of the Capitol. She took time to record the scene, filming the rioters in the Rotunda. While filming, a commotion to the north caught her attention—rioters were waving people into a hallway. *GEX 303*. Carpenter made her way towards them and then turned around to beckon more people to follow. Many rioters responded to her efforts, following Carpenter north, down the hallway leading to the Old Senate Chamber.



*Image 11*: Still from GEX 303 which captures Carpenter waving fellow rioters into the Old Senate Chamber hallway.

Before Carpenter arrived in the hallway, MPD officers established a line to prevent rioters from getting any closer to the Senate Chamber. The rioters massed in front of the MPD officers. As the group amassed in front of the police, one rioter explained to a reporter that the mob's purpose was to confront Senators directly: "This is a contested vote…everyone said this is where the room is and they're down speaking…We wanna get in there and say, 'there's no way that Joe Biden won.'" *GEX 424* at 1:40 through 2:20. During this interview, Carpenter entered the hallway and marched her way to the front of rioters before the police line.



*Image 12: Still from GEX 424 capturing Carpenter positioned at the front of the mob, facing off with MPD officers.*

From her position at the front of the mob, Carpenter immediately antagonized the officers, taunting and trying to intimidate them by getting in their faces, shaking her tambourine, and yelling slogans such as, "it ain't stopping," "this is my house", and telling the officers that she was a "fucking animal." Carpenter's actions encouraged her fellow rioters, who began to chant "Fuck McConnell!" and "This is our house!"



**Image 13:** *Still from GEX 508 showing Carpenter's forcing her way to the front of the mob.*

14



***Image 14****: Still from GEX 508 which captured Carpenter immediately getting in each officers' face.*

One of the officers in this line, MPD Officer Carnell Foster, specifically remembered Carpenter. Officer Foster found Carpenter's behavior alarming for several reasons. First, Carpenter's repeated confrontation with police increased the need for the police to take some action which could have made a dangerous situation worse. 3/8/23 Trial Tr. at 51. Second, Carpenter's repeated chants of being a "fucking animal" raised the prospect of violence because "animals don't abide laws." 3/8/23 Trial Tr. at 53.

Because of her aggressive behavior, officers had to physically push Carpenter back numerous times as she challenged their defensive line. At one point Carpenter slapped away the arm of an officer, who was trying to push her back, with her tambourine. *See* GEX 508, at 6:32. Other rioters even tried, unsuccessfully, to hold her back and dissuade her from further violence. *Id*.



**Image 15:** *Still from GEX 508 capturing other rioters holding Carpenter back.*

During the entire time Carpenter spent in the hallway, she ignored every command to leave. Instead, she joined the mob in pushing against officers to break through them and continue towards the Senate Chamber. The force of the mob almost split the police line in two. Officer Foster testified to the danger that the pushing presented. Some officers lost footing, caught up in the forward moving mob, and had to be helped back behind the police line. Others were forced into a nearby stairwell and had to fend off, then expel, the rioters who followed them into the area.



***Image 16:*** *Still from GEX 111 which captured the aggression of the mob and the dangers officers faced as Carpenter and her little friends started pushing.*

None of the dangers matter to Carpenter. As the mob pushed, Carpenter continued to say, "This is my house" and "no" as officers attempted to force her back. 3/8/23 Trial Tr. at 55. Officers eventually deployed a pepper spray to disperse the crowd. While many of the rioters retreated, Carpenter did not. Carpenter remained, telling the police, "This ain't nothing," when referring to the spray. And, despite the violence and the pepper spray, Carpenter remained at this location for

17

approximately thirteen more minutes. Apparently realizing that her violence would not succeed, Carpenter tried to negotiate her way past officers and into the Senate Chamber itself. Carpenter told police, "I get it, you don't want all these people here" and tried to negotiate a one-on-one tour for the purported reason that she "wanted to inspect [her] house." GEX 513 at 10:15. In total, Carpenter spent seventeen minutes going toe-to-toe with the MPD in the Old Senate Chamber hallway before giving up and retreating to the Rotunda at 3:03p.m.

Despite having just engaged in a violent struggle with police in the Old Senate Chamber, Carpenter still did not leave the Capitol. As she returned to the Rotunda, she saw police massing at one end in preparation for pushing rioters out of the Rotunda, and eventually, out of the Capitol. Still, Carpenter did not leave. To the contrary, Carpenter stayed in the Rotunda until pushed out by police.



*Image 17: Open-source photograph of Carpenter once again came face-to-face with Officer Foster and his fellow MPD officers in the Rotunda (GEX 413).*

At about 3:15 p.m., the police were able to expel Carpenter from the Rotunda, forcing her into the lobby between the Rotunda and the Rotunda Door to the Capitol. *GEX 304*. But even after being ejected from the Rotunda, Carpenter still did not leave the building voluntarily. Instead, Carpenter remained in the lobby before finally exiting the Capitol Building, at 3:18 p.m. through the Columbus doors by the command of officers.

As Carpenter exited the Capitol Building, she raised her tambourine in triumph, celebrating what she believed was her success in stopping Congress from certifying the election result and paving the way for Trump to remain as president. On the steps of the East Rotunda Doors, Carpenter rejoiced, announcing "the breach was made, and it needs to calm down now. Congress needs to come out, they need to certify Trump as president, and this is our house." *GEX 412.B*.



**Image 18**: *Still from GEX 412.B showing Carpenter as she exited the East front doors, proudly shaking her tambourine with a "STOP THE STEAL" sign behind her.*

19

***Defendant's Post-January 6 Statements***

After January 6, Carpenter was fully aware that she had committed crimes at the Capitol, comparing her behavior and that of other rioters to that of "savages":



What the fuck?!? Did I do that for!!! If it were BIM I would be like 'those savages!!'

*Image 19: Text regretting her participation (GEX 934).*

Though aware she had committed crimes, she had no regret, telling a friend that the Inauguration of President Biden was a "desecration" and "worse" than the riot at the Capitol:



Hope you ladies are holding up ok today - the desecration done to our Capitol today is far worse than what happened 2 weeks ago. I'm going to have to put my website plans on hold but please still feel free to create a video to share if you would like to. I've done all I knew to do to stop this tyranny from succeeding so I

*Image 20: Text calling the Inauguration of Joe Biden a "desecration" compared to January 6, 2021 (GEX 931).*

To this day, Carpenter has not expressed any regret for her actions on January 6, 2021. Carpenter denied any wrongdoing, creating a fundraising page in which she called January 6 a "set up" and claimed to be "wrongfully arrested." PSR ¶ 79. Contrary to all the evidence (and her own proclamation on the steps on the Capitol), Carpenter falsely wrote police "waved [her] into the building" and that she witnessed no violence. *Id*. Completely ignoring her own inciteful actions in the Old Senate Chamber, Carpenter placed the blame on other "rebel rousers' referring to the men who held her back in the hallway. *Id*. Carpenter also falsely claimed she was prevented from testifying. *Id*

Conveniently, the fundraising page was disabled shortly after Carpenter's PSR interview. Probation recorded a total of $120 raised as of June 5, 2021 though more might have been raised before the page was deleted. No matter the total, Carpenter has profited off one of the darkest days in America history- a day which she still denies.

## III.   THE CHARGES

On December 1, 2021, a federal grand jury returned a second superseding indictment charging Carpenter with seven counts: Civil Disorder and Aiding and Abetting, in violation of 18 U.S.C. § 231(a)(3), and 2; Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2), and 2; Entering and Remaining in a Restricted Building and Grounds, in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); Impeding Passage Through the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(E); Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

On March 9, 2023, Carpenter was convicted of all seven offenses following a jury trial.

## IV.   STATUTORY PENALTIES

Sara Carpenter now faces sentencing all charges.

As noted by the Presentence Report issued by the U.S. Probation Office, the defendant faces the below penalties and fines:

| Count | Offense | Max Prison Term | Max Term of Supervised Release | Max Fine | Mandatory Special Assessment |
|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 231(a)(3) | 5 years | 3 years | $250,000 | $100 |
| 2 | 18 U.S.C. § 1512(c)(2) | 20 years | 3 years | $250,000 | $100 |

| 3 | 18 U.S.C. § 1752(a)(1) | 1 years | 1 years | $250,000 | $25 |
| 4 | 18 U.S.C. § 1752(a)(2) | 1 years | 1 years | $250,000 | $25 |
| 5 | 40 U.S.C. § 5104(e)(2)(D) | 6 months | n/a | $5,000 | $10 |
| 6 | 40 U.S.C. § 5104(e)(2)(E) | 6 months | n/a | $5,000 | $10 |
| 7 | 40 U.S.C. § 5104(e)(2)(G) | 6 months | n/a | $5,000 | $10 |

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). The PSR applied an aggravated assault cross reference to Count 2, calculating the offense level at 26 and the Guidelines to be 63-78. *See* PSR ¶¶ 63. The government finds no errors in probation's calculation. The government, however, is **not** seeking application of the cross reference. The government's Guidelines analysis follows:

Count One: 18 U.S.C. § 231

| | | | |
|---|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | | 10 |
| U.S.S.G. § 2A2.4(b) | Physical Contact[2] | | +3 |
| | | **Total** | **13** |

Count Two: 18 U.S.C. § 1512(c)(2) and § 2

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Threat or Physical Injury to Person or Property[3] | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference[4] | +3 |

[2] U.S.S.G. § 2A2.4(b) requires a three-point increase when physical contact was made during the offense. Here, Carpenter made physical contact when she 1) swatted at an officer with her tambourine and 2) pushed against the MPD line.

[3] U.S.S.G. § 2J1.2(b)(1)(B) applies because the defendant's offense involved "threatening to cause physical injury to a person . . . in order to obstruct the administration of justice."

[4] The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.8 million dollars in losses. As described herein, law enforcement from all over the D.C. metropolitan area responded to assist in protecting the Capitol

Counts 5, 6, and 7 (**40 U.S.C. § 5104(e)(2)(D), (E) and (G)**) are Class B misdemeanors to which the Sentencing Guidelines do not apply. *See* 40 U.S.C. § 5109(b); 18 U.S.C. § 3559(a)(7); U.S.S.G. § 1B1.9.

### *Grouping Analysis*

Under U.S.S.G. §3D1.2(a) and (c), "closely related counts" group. Counts Two, Three, and Four comprise a single group under U.S.S.G. §3D1.2(a) and (b) because the victim of each count is Congress. Under U.S.S.G. §3D1.3(a), we then determine the offense level for a group of closely related counts, using the highest offense level of the counts in the group. The highest offense level is 25 (for Count Two); therefore, the combined offense level for this group ("Group 1") is 25.

Since Count One does not group with the remaining counts (as the victim of that count is the line of MPD officers whom Carpenter obstructed, interfered with, and impeded) and is accordingly a separate group ("Group 2"), we then determine the number of units pursuant to U.S.S.G. §3D1.4. Pursuant to U.S.S.G. §3D1.4(a), one unit would be added for Group 1. Also, because the offense level for Group 2/Count One is 13, which is more than 9 levels less serious than the offense level for Group 1, Group 2 can be disregarded pursuant to 3D1.4(c).

**The final offense level is thus 25.**

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 66. Accordingly, based on the government's calculation of the defendant's

---

from the rioters. Carpenter directly contributed. Carpenter admitted as such, she beamed with pride as she told the world she breached the building, caused a disturbance, all in the name of her goal: interfering with the certification of the Electoral College vote so that former President Trump would remain president.

total adjusted offense level at 25, Carpenter's Guidelines imprisonment range is 57 to 71 months of imprisonment.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case because Carpenter directly threatened police officers who were defending the Senate Chamber and physically attacked one with her tambourine. Thus, Carpenter fails to meet the criteria of U.S.S.G. § 4C1.1(3) ("the defendant did not use violence or credible threats of violence in connection with the offense").

The government notes that in calculating the base offense level for Group Two (consisting of Count One), the PSR recommends that the base offense level be determined using § 2A2.2, based on the cross-reference of §2A2.4(c) for cases involving an aggravated assault. PSR ¶ 52. With a six-level enhancement for an official victim, the resulting offense level is 20. PSR ¶ 56. As a result, the PSR contains a one level increase, to 26, based on the multiple count adjustment of § 3D1.4, resulting in a sentencing range of 63 to 78 months. PSR ¶ 59, 116.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Carpenter's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United

States into a Constitutional crisis. Carpenter anticipated violence, encouraged others to follow her, and used violence while attempting to achieve her goal: blocking the certification of the 2020 presidential election to keep President Trump in power illegally. She repeatedly put herself at the front line of the rioters, threatening police, and riling up the mob. Carpenter demonstrated brazen disrespect for every form of authority she encountered on January 6, laughing and screaming in the face of her own fraternal order. The nature and circumstances of Carpenter's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 66 months' incarceration.

### B.  The History and Characteristics of the Defendant

Carpenter is a former NYPD officer who claims to be on disability. PSR ¶ 86. Despite her claims, Carpenter has declined to provide Probation with any medical documentation establishing any such disability. Absent such evidence, the government submits that Carpenter has no mental or physical disability relevant to sentencing.

Carpenter's prior service as an NYPD, while ordinarily mitigating, is an aggravating factor in this case. Her conduct on January 6 was a rejection of the law she swore to uphold as an officer, and a betrayal of her fellow officers. That she could engage in such conduct without any remorse, and that she continues to deny the seriousness of January 6th and downplays her role in one of the most shameful days in American history demonstrates her lack of respect for the rule of law.

Consistent with this lack of respect, Carpenter has refused to cooperate with Probation by providing relevant information or sign release forms (ECF No. 104 ¶¶ 86, 98, 100, 111). Even when purporting to cooperate, Carpenter has misled probation, claiming to have a mortgage on her home when public records show the mortgage has been satisfied (ECF 104 ¶105).

Carpenter's history and characteristics weigh heavily in favor of a lengthy term of incarceration.

### C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Carpenter's criminal conduct on January 6 and her continued denial of wrongdoing are the epitome of disrespect for the law.

### D.      The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this defendant also weighs heavily in favor of a lengthy term of incarceration. Carpenter clearly does not appreciate the seriousness and impact of her crimes; therefore, she is at high risk to reoffend. Carpenter continued to spread lies and misinformation long after January 6. Carpenter falsely claims she did not view any violence despite perpetrating the violence herself. PSR ¶ 79. GEX 412.B is clear evidence of her proud admission to her crimes, yet Carpenter still denies her intentions and blatantly lies that

---

[5] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

26

she was "invited" into the Capitol. *Id.*

### E.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.   Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United

States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier

'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[7]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

First, in *United States v. Anthony Williams*, 21-cr-377 (BAH), a jury convicted the defendant of one count of 18 U.S.C. § 1512(c)(2) and four misdemeanor offenses (Williams was not charged with violating § 231(a)(3)). Williams was part of a mob of that overran police on the Northwest stairs leading up to the Upper West Terrace and in the Crypt. Williams then resisted and mocked police when they tried to remove him from the building. Afterwards, Williams, like

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Carpenter, showed little remorse. Williams' total adjusted offense level was also 25 and his Guideline range was 57 – 71 months. Following a jury trial, Chief Judge Howell sentenced Williams to 60 months on the § 1512(c)(2) count, and concurrent periods of incarceration for the misdemeanors.[8] Here, Carpenter is deserving of a high sentence due to attempts to obstruct and impede officers by pushing them back in the Old Senate Chamber hallway.

In *United States v. Joshua Douglas Wright*, 21-cr-23 (TJK), Wright organized buses to travel to D.C. for the rally. After the rally, Wright overran officers on the east side of the Capitol by pushing the police barriers into officers. After other rioters breached the Columbus doors, Wright entered and walked into the Rotunda where he streamed video and smoked a cigarette. Afterward, Wright celebrated the actions of the rioters calling January 6 a "practice run." Wight pleaded guilty to § 1512(c)(2), and, receiving a three-point deduction, faced guidelines of 41-51 months. Wright was sentenced to an upper end of 49 months' incarceration. Like Wight, Carpenter pushed against officers to advance her goal: stopping the certification. Unlike Wright, Carpenter has yet to accept responsibility and her actions of pushing officers (especially in an area most rioters thought was the Senate), is deserving of a sentence on the higher end of the guidelines.

In *United States v. Daniel Egtvedt*, 21-cr-177 (CRC), a jury convicted the defendant of violating 18 U.S.C. § 1512(c)(2) and § 231(a)(3). Egtvedt was part of a mob that overran the police during the second breach of the Senate Wing Doors. Once inside the Capitol, Egtvedt encouraged more rioters to come to the Capitol, berated law enforcement, and physically resisted police

---

[8] In *Williams*, the government recommended, that the Court sentence Williams to 64 months' incarceration.

30

officers' commands to leave, injuring an officer in the process. Egtvedt's Guidelines were the same as Carpenter's and was sentenced to 42-months after a bench trial.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Carpenter was convicted of violating offenses under Title 18, so the VWPA applies.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use

the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[9]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for her individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general

---

[9] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Carpenter to pay $2,000 in restitution for her convictions on Counts One through Four. This amount fairly reflects Carpenter's role in the offense and the damages resulting from her conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 66 months of incarceration, three years of supervision, $2,000 in restitution, and a mandatory assessment of $280.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:      */s/ Rebekah E. Lederer*_____
REBEKAH E. LEDERER
Assistant United States Attorney
Pennsylvania State Bar No. 320922
601 D St., NW
Washington, D.C. 20530
(202) 252-7012
rebekah.lederer@usdoj.gov